**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
|  | : |  |
| IN RE MERCEDES-BENZ ANTITRUST | : | **OPINION** |
| LITIGATION | : |  |
|  | : | Master No. 99-4311 (WHW) |
|  | : |  |
|  | : |  |

**Walls, Senior District Judge**

Defendants Mercedes-Benz USA, LLC ("MBUSA") and Mercedes-Benz Manhattan, Inc.

("MBM") move for summary judgment.  The Court addresses these as well as various

exclusionary motions filed by both plaintiffs and defendants.

## FACTS AND PROCEDURAL BACKGROUND

The Court previously summarized the basic facts of this case in its opinion reported at

157 F. Supp. 2d 355 (D.N.J. 2001).  In brief, plaintiffs allege that MBUSA, the national

distributor of Mercedes-Benz automobiles, along with twenty-four of its dealers in the New York

Region and the accounting firm Sheft Kahn & Co., LLP ("Sheft Kahn"), engaged in a *per se*

unlawful price-fixing conspiracy to limit discounting of new automobiles sold or leased in the

New York Region between February 1992 and August 1999.  The New York Region includes

dealers in New York City as well as suburban New York, New Jersey, and Connecticut.  MBM is

wholly-owned by MBUSA and is the only dealer-defendant in this case that is not an independent

franchise.  According to plaintiffs,

> The conspiracy had two central aspects.  The first involved the Sheft Kahn Group,
> consisting of New York Region dealers, including MBM, which: 1) created detailed
> reports of members' gross profits and pricing-related information, which were widely
> shared and discussed among the allegedly competing members, and 2) held meetings,
> attended by MBM, and which attendance by other dealers was encouraged and
> directed by MBUSA, involving extensive pricing-related discussions of historical and
> anticipated gross profits among supposed competitors, which allowed the co-

FOR PUBLICATION

conspirators to determine price-levels at which new Mercedes-Benz vehicles were sold or leased.

        The second aspect involved MBUSA's communications and directives to its New York Region dealers, which included discussions regarding "gross profit per vehicle" by MBUSA officials directly with New York Region dealers during regular, in-person visits to the dealers. These communications were an essential means of implementing, monitoring, and enforcing compliance with defendants' overall conspiracy of maintaining the price of new Mercedes-Benz vehicles at artificially inflated levels. The overall goal was to insure that all New York Region dealers were selling vehicles at as close to list price as possible in order to meet MBUSA's and the dealers' mutual 10% retained gross profit target and eliminate competition among New York Region dealers.

(Opp'n Br. at 1-2.)

Plaintiffs have survived a motion to dismiss and have received class certification pursuant to Fed. R. Civ. P. 23(b)(3). Discovery is complete and settlements have been finally approved for six dealer-defendants and preliminarily approved for sixteen dealer-defendants as well as Sheft Kahn. MBUSA, MBM, and dealer-defendant Beifus Motors have not agreed to settle.

MBUSA now makes the following motions: (1) Motion for Summary Judgment; (2) Motion for Leave to File a Motion for Partial Summary Judgment Dismissing Claims of C-Class Plaintiffs; (3) First Motion *in Limine*; (4) Motion to Strike the Affidavit of John C. Beyer, Ph.D. Regarding Impact of Lessors of New Mercedes-Benz Vehicles; (5) Motion to Strike the Testimony and Opinion of John C. Beyer; and (6) Motion to Strike the Testimony and Opinion of Harris L. Devor. MBM makes a Motion for Summary Judgment only. Plaintiffs have filed: (1) Motion to Exclude Defendants from Introducing the Expert Report and Testimony of James A. Anderson and (2) Motion to Strike the Expert Testimony of Richard H. Kotzen.

FOR PUBLICATION

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant and it is material if, under the substantive law, it would affect the outcome of the suit.  Id. at 248.  The moving party must show that if the evidentiary material of record was reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof.  Celotex v. Catrett, 477 U.S. 317, 318 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  To survive a motion for summary judgment, a non-movant must present more than a mere scintilla of evidence in his favor.  Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005).  The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings.  Shields v. Zuccarini, 254 F.3d 476, 481 (3d Cir. 2001).  At the summary judgment stage the Court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.  In doing so, the Court must construe the facts and inferences in the light most favorable to the non-moving party.  Curley v. Klem, 298 F.3d 271, 277 (3d Cir. 2002).

FOR PUBLICATION

## DISCUSSION

### I.  The 10% Retained Gross Profit Issue

In its First Motion *in Limine*, MBUSA seeks to exclude "all evidence of MBUSA's 10% retained gross profit objective from consideration in summary judgment and, if necessary, trial." (MBUSA's Br. at 14.)  The basis for the motion is this Court's unpublished decision of July 11, 2005, affirming recommendations of the Special Master appointed to this case and overruling objections to the same.  The Special Master issued a recommendation on March 3, 2005 in response to defendants' application for sanctions for plaintiffs' failure to respond to certain interrogatories.  The recommendation was that, with the exception of newly discovered evidence, plaintiffs "should be barred from introducing evidence not *referred to or alluded to* in their interrogatory answers."  (emphasis added).  In support of his recommendation, the Special Master said:

> I am concerned about trial by ambush.  A party should not be permitted to hold back information, evidence or contentions when appropriate interrogatories have been propounded.  The time to seasonably amend interrogatory answers has passed, except for newly unearthed or produced information such as the outstanding depositions and expert reports. . . .  I realize that the generality of plaintiffs' responses makes this recommendation difficult to enforce.  My intent is to prohibit plaintiffs from coming forward with evidence, for example, that in February 1997 dealer X and dealer Y agreed not to discount certain models by more than 2 percent.  The time to produce this kind of detailed information has pas[sed].

(Cooper Cert. Ex. 5 at 2.)  In a supplemental recommendation of March 8, 2005, the Special Master further articulated his reservations:

> My concern is that defendants not be confronted with the so-called "smoking gun" - a document not previously disclosed that provides clear, specific evidence of price fixing.  As I see it, plaintiffs' case, as disclosed, consists of an effort to prove price fixing by reference to a variety of facts that, when linked together, provide reasonable support for the conclusion that price fixing occurred.  Plaintiffs' interrogatory answers refer to and allude to the categories of such evidence.

FOR PUBLICATION

(Cooper Cert. Ex. 6.)  The Court's adoption of the Special Master's recommendation was made

pursuant to Fed. R. Civ. P. 37(b)(2)(B) and 37(d), which allow the Court to sanction a party that

fails to answer interrogatories with "such orders in regard to the failure as are just," including

"[a]n order refusing to allow the disobedient party to support or oppose designated claims or

defenses, or prohibiting that party from introducing designated matters in evidence."  The

question now presented to the Court, then, is whether plaintiffs' invocation of MBUSA's 10%

gross profit objective is permissible at summary judgment and trial or whether it runs afoul of the

Court's earlier restrictions and must be excluded.

MBUSA argues that "10%" appears nowhere in plaintiffs' interrogatory responses and

that it was neither "referred to or alluded to" in those responses.  MBUSA also contends that it

has been "sandbagged," causing severe prejudice.  There is apparently no dispute that plaintiffs

did not explicitly cite the 10% figure in the interrogatory responses, so the Court must determine

whether plaintiffs referred or alluded to this figure and whether there is a danger of "trial by

ambush" that would unduly prejudice MBUSA.

In support of their invocation of the 10% retained gross profit objective, plaintiffs make a

number of arguments.  First, they argue that MBUSA cannot be ambushed by its own documents

produced during discovery and well-known to it.  Second, plaintiffs contend that the

interrogatory answers do refer or allude to the 10% objective.  Third, they argue that MBUSA

opened the door to the issue by explicitly referring to the 10% objective in its brief in support of

**FOR PUBLICATION**

the summary judgment motion.  Finally, plaintiffs claim that MBUSA is not prejudiced by the consideration of the 10% objective.[1]  The Court examines each of these arguments in turn.[2]

On the first point, plaintiffs argue that MBUSA produced documents that demonstrate the 10% gross profit objective, that MBUSA admits the objective, and that MBUSA attorneys were present at more than twenty depositions during which the objective was discussed.  MBUSA's essential argument in response is that it has always known of and admits the 10% *objective*, but was unaware of plaintiffs' *theory* that the objective was also the goal of the alleged price-fixing conspiracy.  Since no party argues that a unilateral objective of 10% retained gross profits on the part of MBUSA would constitute an antitrust violation, MBUSA's distinction is an important one.  That MBUSA was well aware of its own 10% objective does not mean that plaintiffs had no responsibility to fully articulate their theory in interrogatory answers.  Whether plaintiffs adequately fulfilled their responsibilities in responding to interrogatories and whether MBUSA is unduly prejudiced by any failure in this regard are the material questions before the Court.

In their second argument, plaintiffs contend that they "referred to or alluded to" the 10% figure in their interrogatory answers.  Plaintiffs' material interrogatory response, stating the goals of the price-fixing conspiracy, reads:

---

[1]Plaintiffs' fifth argument, that the Court's order allowed them to amend interrogatory responses through December 16, 2005, is now moot because no such amendments have been filed.  In any event, such amendments would only have been timely under the Court's order if based on newly discovered evidence.  No newly discovered evidence is apparent.

[2]For purposes of clarity, the Court will distinguish between the "10% *objective*," which MBUSA admits, and the "10% *theory*," which MBUSA denies and alleges is being posited for the first time in plaintiffs' opposition to summary judgment.  The "objective" is MBUSA's 10% retained gross profit target for its dealership network and the "theory" is plaintiffs' contention that the objective was the goal of the alleged price-fixing scheme.  In plaintiffs' own words, "[t]he [Sheft Kahn] group's goal was to increase profits to the minimum retained gross profit of 10%, which was also the mutual goal of MBUSA and its dealers."  (Pl.'s Summ. J. Opp'n Br. at 37.)

**FOR PUBLICATION**

> The goals of the price-fixing conspiracy was [*sic*] to raise, fix, maintain and/or stabilize the price of all brands of new Mercedes-Benz vehicles sold or leased in the New York Region during the relevant time period (*i.e.*, February of 1992 through August of 1999) above levels that would have applied but for the conspiracy, and to restrict or eliminate competition among New York Region MB Centers in the sale or lease of new Mercedes-Benz vehicles.

(Cooper Cert. Ex. 4 at 5.)  In response to another interrogatory, plaintiffs further describe the

alleged conspiracy:

> The price-fixing conspiracy was a single, overarching conspiracy to reduce, and if possible eliminate, discounting from MBUSA's manufacturers' suggested retail price by New York region MB centers in connection with the sale and leasing of all brands of new Mercedes-Benz vehicles.  The participants of the price-fixing conspiracy did not specify in advance the precise amount or range of percentages by which discounting would be eliminated or reduced.  The purpose and effect of the conspiracy was to reduce the overall level of discounting from defendant MBUSA's specified recommended retail price for all new Mercedes-Benz vehicles.
>
> The defendant dealers, MBUSA and Sheft Kahn, collectively participated in this price-fixing conspiracy through various means and at various times, all as specified in Plaintiffs' Prior Interrogatory Answers. . . .

(Cooper Cert. Ex. 4 at 2.)  "Plaintiffs' Prior Interrogatory Answers" apparently did not cite the

10% figure, so the Court is left to determine whether these general answers reasonably refer or

allude to the 10% theory.  As the Special Master noted with prescience, "the generality of

plaintiffs' responses makes [my March 3, 2005] recommendation difficult to enforce."  His

March 8, 2005 supplemental recommendation provides valuable explication, however: "As I see

it, plaintiffs' case, as disclosed, consists of an effort to prove price fixing by reference to a variety

of facts" and "Plaintiffs' interrogatory responses refer to and allude to the categories of such

evidence."  As this Court sees it, the 10% figure is one of the various facts which plaintiffs'

interrogatory responses refer and allude to.  While plaintiffs' responses lack detail, the Court

previously accepted them subject to limitation.  That limitation was primarily concerned with a

"smoking gun" that would "ambush" defendants by providing "clear, specific evidence of price

FOR PUBLICATION

fixing." The Court does not believe that plaintiffs' 10% theory amounts to a "smoking gun," and it is in no way clear evidence of price-fixing. If plaintiffs' vague interrogatory responses have truly caused MBUSA to be "ambushed," however, the Court would consider enforcing its sanction. A successful ambush requires both surprise and resultant injury, so the Court must determine whether MBUSA has been both surprised and injured.

Plaintiffs' contend that MBUSA has feigned surprise and was well aware of plaintiffs' intention to use the 10% objective as an element of the price-fixing conspiracy. The primary argument made on this point is that MBUSA addressed the 10% objective in its summary judgment papers. MBUSA said the following in its summary judgment brief:

> Plaintiffs' "evidence" of what they have termed MBUSA's "complicity" in the alleged price-fixing agreement seems to fall into three categories: (1) MBUSA's announcement of a 10% retained gross profit target for its national dealer network coupled with communications market managers had with dealers regarding dealership profitability; (2) MBUSA's enforcement of its nationwide guidelines regarding price advertising; and (3) MBUSA's connections to the Sheft Kahn group.

(MBUSA's Summ. J. Br. at 30.) Obviously, MBUSA anticipated that plaintiffs would use the 10% objective to link it to the overall alleged price-fixing conspiracy, and admits as much:

> MBUSA did anticipate that Plaintiffs might try to misuse the 10% target in an attempt to connect MBUSA to a price-fixing conspiracy for which Plaintiffs, hypothetically, might have proof. Thus, in its memorandum in support of its summary judgment motion, MBUSA briefly mentioned that there is no evidence that the 10% target was anything but aspirational and that communications of targets and pricing information between manufacturers and their dealers has been expressly sanctioned by the Supreme Court.

(MBUSA's Br. at 13 n.6.) MBUSA cannot credibly argue that plaintiffs have suddenly produced a "smoking gun" that has taken it by surprise. Rather, it seems that plaintiffs have used facts well-known to MBUSA to refine the overall price-fixing conspiracy theory that was generally articulated in the interrogatory responses. No new evidence has been produced and plaintiffs'

-8-

**FOR PUBLICATION**

contention does not substantially alter the overall theory.  The burden remains with the plaintiffs to link the admitted 10% objective to the alleged conspiracy.  Because plaintiffs' interrogatory responses are undoubtedly vague, however, the Court will examine the nature of MBUSA's alleged injury to determine whether equitable concerns require exclusion.

MBUSA claims that the Court's consideration of the 10% theory would cause "severe prejudice" because defendants were unable to conduct discovery on the 10% theory, were denied the opportunity to evaluate and challenge the theory during the expert discovery phase, and were unable to challenge the theory "head-on" in their motion for summary judgment.  Plaintiffs counter that MBUSA has suffered no injury because they *did* question plaintiffs' witnesses, including "star" witness Tamim Shansab, about the 10% objective; they *could* have asked plaintiffs' experts about it; and they *did* address it in their summary judgment papers.  While the Court accepts that MBUSA would likely have spent more time addressing the 10% theory had plaintiffs articulated it in their interrogatory responses, the Court does not see how defendants have been substantially prejudiced.  They have more fully responded to the theory in their reply brief, will have further opportunity to do so at trial, and have had the motivation throughout discovery to separate the admitted 10% objective from the alleged price-fixing conspiracy and to demonstrate that there was no agreed-upon target as part of the alleged price-fixing conspiracy.  To the extent that MBUSA has suffered any injury, it is slight.

To conclude, the Court finds that the concerns underlying its earlier sanction are not substantially implicated here.  While plaintiffs could have been more forthright in articulating their theory, they have not engaged in "trial by ambush."  MBUSA has not been surprised or

**FOR PUBLICATION**

injured in a manner that would justify the exclusionary remedy that it seeks.  MBUSA's First

Motion *In Limine* is denied.

## II.  The Experts

Under Fed. R. Civ. P. 702, "[i]f scientific, technical, or other specialized knowledge will

assist the trier of fact in issue, a witness qualified as an expert by knowledge, skill, experience,

training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the

testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable

principles and methods, and (3) the witness has applied the principles and methods reliably to the

facts of the case."  The Third Circuit has said that Rule 702 "embodies a trilogy of restrictions on

expert testimony:  qualification, reliability and fit."  Schneider v. Fried, 320 F.3d 396, 404 (3d

Cir. 2003).

"The test of admissibility is not whether a particular scientific opinion has the best

foundation or whether it is demonstrably correct.  Rather, the test is whether the 'particular

opinion is based on valid reasoning and reliable methodology. . . .  The analysis of the

conclusions themselves is for the trier of fact when the expert is subjected to

cross-examination.'"  Oddi v. Ford Motor Co., 234 F.3d 136, 145-46 (3d Cir. 2000) (quoting

Kannankeril v. Terminix Int'l Inc., 128 F.3d 802, 806 (3d Cir. 1997)).  In exercising its

"gatekeeper" function under Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1992), the

district court must ensure "that an expert, whether basing testimony upon professional studies or

personal experiences, employs in the courtroom the same level of intellectual rigor that

characterizes the practice of an expert in the relevant field."  Kumho Tire Co. v. Carmichael, 526

U.S. 137, 152 (1999).

FOR PUBLICATION

"Daubert's requirement that the expert testify to scientific knowledge—conclusions supported by good grounds for each step in the analysis—means that *any* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology*." In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 745 (3d Cir. 1994) (emphasis in original). "[T]he judge should not exclude evidence simply because he or she thinks there is a flaw in the expert's investigative process which renders the expert's conclusions incorrect. The judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." Id. at 746. "The grounds for the expert's opinion merely have to be good, they do not have to be perfect." Id. at 744.

Factors for the Court to consider on the question of reliability include, but are not limited to:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

Id. at 742 n.8. The party seeking to admit expert evidence must demonstrate by a preponderance of the evidence that it is reliable. Id. at 743-44.

In order to satisfy its responsibilities under the Federal Rules of Evidence and Daubert, the Court conducted extensive evidentiary hearings to assess the qualification, reliability, and fit of both plaintiffs' and defendants' experts. Although such hearings are not always required, it is the preference of this Circuit that they be conducted, particularly where summary judgment might

FOR PUBLICATION

result from the exclusion of an expert.  In re TMI Litig., 199 F.3d 158, 159 (3d Cir. 2000).  The

Daubert hearings were conducted on May 3, 4, and 5, and June 13 and 14, 2006, and provided

the opportunity for direct examination, cross-examination, presentation of evidence, and oral

argument with respect to each of the challenged experts.  In addition to testimony from each of

the experts subject to a Daubert motion, Dr. John C. Beyer, James A. Anderson, Richard H.

Kotzen, and Harris L. Devor, the Court heard testimony from MBUSA's expert economist, Dr.

Jonathan B. Baker.  Although the Court rendered oral rulings on the admissibility of the expert

testimony under the Federal Rules of Evidence, the Court now examines procedural objections to

certain testimony arising elsewhere.

### A.  The Beyer Affidavit

MBUSA moves to strike Dr. John C. Beyer's Affidavit of September 28, 2005 ("the

Affidavit") on two grounds:  (1) it was submitted after the time for expert discovery had passed,

and (2) it is unreliable.  On the first point, MBUSA argues that the Affidavit was submitted more

than three months after expert discovery had concluded and contains new opinions.  On the

second point, MBUSA contends that Dr. Beyer cites no authority nor any basis for his

conclusions regarding the mechanics of leasing transactions and that Dr. Beyer has no expertise

in the automotive industry that would allow him to reliably draw such conclusions.

Plaintiffs counter that the Affidavit is permissible under Fed. R. Civ. P. 56(e) so long as it

clarifies earlier testimony, and they argue that it does.  On the question of reliability, plaintiffs

contend that, as an expert economist that has conducted an extensive damages analysis in this

case, Dr. Beyer is qualified to testify as to which class members were damaged.  Plaintiffs also

argue that expertise in a particular industry goes to weight rather than admissibility.

FOR PUBLICATION

On the question of timeliness, the Court finds that the Affidavit is properly before the

Court.  Although it was clearly submitted after the time for expert discovery had passed, the

Court finds the Affidavit to be admissible under Rule 56(e).  The Affidavit discusses the

mechanics of automotive leasing transactions and their effect on Dr. Beyer's damages analysis in

order to show that the analysis applies equally to both retail purchasers and lessees.  Plaintiffs

have taken the position throughout this litigation that the overcharges resulting from the alleged

conspiracy were paid in their entirety by the lessees and that no part of the overcharge was

absorbed by Mercedes-Benz Credit Corporation (MBCC).  Additionally, if plaintiffs prove the

alleged conspiracy, they will have shown that the lessees were injured.  See In re Mercedes-Benz

Antitrust Litig., 364 F. Supp. 2d 468, 481-82 (D.N.J. 2005) (finding it to be undisputed that the

alleged price-fixing scheme would have injured lessees and noting that the disputed question is

whether the leasing companies would have been injured).  In order to recover, of course,

plaintiffs must still prove their damages.  Since the Court has already determined that Dr. Beyer's

damages estimate is admissible, plaintiffs have adequate evidence to show damage to all lessee

class members that did not lease through MBCC.[3]  With regard to the non-MBCC transactions,

then, the question is one of allocation of damages between lessee and lessor class members, a

subject of no concern to MBUSA.  For transactions involving MBCC, however, whether MBCC

absorbed any portion of the overcharge is a material question.  In order to rely on Dr. Beyer's

aggregate damages estimate for class members who leased Mercedes-Benz vehicles through

MBCC, plaintiffs bear the burden of showing that MBCC did not absorb a significant portion of

---

[3]Most lessors are members of the class, but not MBCC.  This is because the class definition excludes "the
defendant MBUSA, its parents, subsidiaries, affiliates, and employees."  (Compl. at ¶ 19.)  MBCC's exclusion
means that lessees who leased through MBCC stand in a somewhat different position from those who leased through
lessor class-members.

**FOR PUBLICATION**

the overcharge in order to demonstrate reasonably ascertainable damages.  Plaintiffs submitted

the Affidavit in the face of MBUSA's motion for summary judgment for precisely this purpose.

Without the Affidavit, plaintiffs might have difficulty showing that MBCC did not absorb a

portion of the overcharge.  It is clear, then, that exclusion of the Affidavit is a sanction with

serious consequences for plaintiffs.  The Court's analysis of the law indicates that such sanction

is unwarranted here.

It is undisputed that the Affidavit was submitted more than three months after the close of

expert discovery in this case.  Under Fed. R. Civ. P. 26(a)(2)(B), the expert report "shall contain

a complete statement of all opinions to be expressed and the basis and reasons therefore."  A

party that fails to make such disclosures "is not, unless such failure is harmless, permitted to use

as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed."

Fed. R. Civ. P. 37(c)(1).  Notwithstanding the rule, "'the exclusion of critical evidence is an

extreme sanction, not normally to be imposed absent a showing of willful deception or flagrant

disregard of a court order by the proponent of the evidence.'"  In re Paoli, 35 F.3d at 791-92

(quoting Meyers v. Pennypack Woods Home Ownership Ass'n, 559 F.2d 894, 905 (3d Cir.

1977)).  The factors to be considered in making such a decision include:

> (1) the prejudice or surprise of the party against whom the excluded evidence is
> offered, (2) the ability of that party to cure the prejudice, (3) the extent to which
> waiver of Rule 37 sanctions would disrupt the orderly and efficient trial of the case
> or of other cases in the court, and (4) bad faith or willfulness in failing to make a
> required disclosure or comply with a court order.

In re Safeguard Scientifics, No. 01-3208, 2004 WL 2644393, at *2 (E.D. Pa. Nov. 17, 2004);

accord In re Paoli, 35 F.3d at 791.

FOR PUBLICATION

Applying these factors, the Court finds that MBUSA has not been significantly surprised or prejudiced, that any prejudice is easily curable, that waiver of sanctions would not disrupt the orderly trial of the case, and that plaintiffs did not act in bad faith.  Although the Court believes that the Affidavit does contain some new information, the Court finds the additional information to be substantially harmless.  If MBCC raised residual values of its leased vehicles as a result of the alleged conspiracy and suffered injury as a result, MBUSA has had every opportunity to produce such evidence.  It has not done so.  MBUSA cannot now claim to be surprised by the information contained in the Affidavit because that information is entirely consistent with plaintiffs' position throughout this litigation.  The Affidavit simply clarifies that Dr. Beyer's damages calculation includes lessees, in accordance with plaintiffs' contention that lessees were injured in the same way that retail purchasers were injured.  Nothing in the Affidavit conflicts with Dr. Beyer's earlier testimony.  Because Dr. Beyer has included some new information concerning the mechanics of leasing transactions that is not found in his earlier reports, however, the Court will allow MBUSA to re-depose Dr. Beyer on the issues contained in the Affidavit. Any such request must be made to the Court by letter within 10 days of the filing of this opinion.

On the question of reliability, the Court is satisfied that Dr. Beyer is qualified to opine on the mechanics of automotive leasing transactions and their relationship to his damages analysis based on his education, experience, and investigation of the record in this case.

### B.  The Testimony of Richard H. Kotzen

Plaintiffs object to the testimony of Mr. Kotzen on the grounds that he relied on witness testimony that MBUSA willfully did not disclose during fact discovery.  Plaintiffs argue that this violates Fed. R. Civ. P. 26(a)(1) and that exclusion of Mr. Kotzen's report and testimony is

FOR PUBLICATION

required under Fed. R. Civ. P. 37(c)(1).  MBUSA counters that the financial personnel Mr.

Kotzen interviewed for the purposes of his expert opinion need not be disclosed under Rule 26

and that such interviews are merely the type of information which is "reasonably relied upon by

experts in the particular field in forming opinions or inferences on the subject."  Fed. R. Civ. P.

703.  Additionally, MBUSA contends that it followed the Case Management Order and identified

the bases for Mr. Kotzen's opinions, including the interviews.  Finally, MBUSA argues that

plaintiffs were neither surprised nor prejudiced by Mr. Kotzen's reliance on the interviews

because many of the individuals were identified during fact discovery and plaintiffs could have

learned of others through discovery, but plaintiffs chose neither to depose those it knew of nor to

seek the identities of the others.

The Court finds plaintiffs' arguments unpersuasive.  It is questionable whether the

subjects of Mr. Kotzen's interviews are used "to support [MBUSA's] claims or defenses," and

must be disclosed under Rule 26(a)(1).  Even if the rule applies, however, the Court finds the

non-disclosure of Mr. Kotzen's interview subjects to be substantially harmless and of limited

surprise and prejudice to plaintiffs.  Mr. Kotzen's report was submitted in March 2004, but

plaintiffs apparently failed to bring the issue of the interviews to the Court's attention until the

filing of this motion in August 2005.  Had plaintiffs raised the issue at an earlier date, any

prejudice could have been readily cured by the opportunity to depose the interview subjects.

Rather than taking this course of action, however, plaintiffs chose to wait and seek the "extreme

sanction" that they now request.  Because the Court does not believe that such sanction is

warranted or that MBUSA's non-disclosure was in bad faith, plaintiffs' motion is denied.

FOR PUBLICATION

### III.  The Alleged Conspiracy and MBUSA's Motion for Summary Judgment

Section 1 of the Sherman Act proscribes "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce."  15 U.S.C. § 1.  A horizontal price-fixing conspiracy, as plaintiffs characterize their allegations, occurs "where competitors at the same market level agree to fix or control the prices they will charge for their respective goods or services."  United States v. Brown Univ., 5 F.3d 658, 670 (3d Cir. 1993).  Such schemes are per se unreasonable because they "always or almost always tend to restrict competition" and are banned "because of their actual or potential threat to the central nervous system of the economy." In re Flat Glass Antitrust Litig., 385 F.3d 350, 356 (3d Cir. 2004) (internal citations omitted).  In order to prevail on such a claim, "plaintiffs need only prove that 'the defendants conspired among each other and that this conspiracy was the proximate cause of the plaintiff's injury.'"  Id. (quoting InterVest, Inc. v. Bloomberg, L.P., 340 F.3d 144, 158 (3d Cir. 2003)).  Because "the existence of an agreement is 'the very essence of a section 1 claim,'" a plaintiff is required to prove "'some form of concerted action.'"  In re Flat Glass, 385 F.3d at 356-57 (quoting Alvord-Polk, Inc. v. Schumacher & Co., 37 F.3d 996, 999 (3d Cir. 1994)).  "In other words, there must be a 'unity of purpose or a common design and understanding or a meeting of minds' or a 'conscious commitment to a common scheme.'"  Id. (quoting Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764 (1984)).  Plaintiffs in this case allege that such an agreement existed and contend that they have both direct and circumstantial evidence to prove it.  MBUSA denies that any conspiracy existed and counters that there is no direct evidence nor any circumstantial evidence in the record that is adequate as a matter of law to survive a motion for summary judgment.

FOR PUBLICATION

"Direct evidence in a Section 1 conspiracy must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted."  In re Baby Food Antitrust Litig., 166 F.3d 112, 118 (3d Cir. 1999).  Circumstantial evidence, by contrast, requires the fact finder to draw inferences in order to reach the conclusion that is advanced.  The Third Circuit has held that:

> [a] plaintiff may utilize either direct or circumstantial evidence in order to make out the element of concerted action.  While direct evidence, the proverbial "smoking-gun," is generally the most compelling means by which a plaintiff can make out his or her claim, it is also frequently difficult for antitrust plaintiffs to come by.  Thus, plaintiffs have been permitted to rely solely on circumstantial evidence (and the reasonable inferences that may be drawn therefrom) to prove a conspiracy.

Rossi v. Standard Roofing, Inc., 156 F.3d 452, 465 (3d Cir. 1998).  Where there is direct evidence,

> the plaintiff need not adduce circumstantial evidence "that tends to exclude the possibility that the alleged conspirators acted independently," and there need not be an inquiry into the plausibility of the defendants' claim or the rationality of defendants' economic motives.  This is because when the plaintiff has put forth direct evidence of conspiracy, the fact finder is not required to make inferences to establish facts, and therefore the Supreme Court's concerns over the reasonableness of the inferences in antitrust cases evaporate.

Id. at 466 (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986)).

In Matsushita,

> [t]he Supreme Court did not draw a distinction between direct evidence on the one hand and circumstantial evidence on the other.  Rather, it stated that in the absence of a plausible theory of conspiracy, a court must consider whether the plaintiff put forward "sufficiently unambiguous" evidence that the defendants conspired.  Therefore, in section 1 cases, it is unnecessary for a court to engage in the exercise of distinguishing strong circumstantial evidence of concerted action from direct evidence of concerted action for both are "sufficiently unambiguous."

Petruzzi's IGA v. Darling-Delaware, 998 F.2d 1224, 1233 (3d Cir. 1993) (quoting Matsushita, 475 U.S. at 597).  Matsushita, then, provides two steps to guide the Court's summary judgment

FOR PUBLICATION

determination in the absence of sufficiently unambiguous evidence.  The first step asks whether

the alleged conspiracy is an economically plausible one.  The second step requires an

examination of plaintiffs' proffered evidence to determine whether it is sufficient to survive a

motion for summary judgment.  "[I]f the factual context renders respondents' claims

implausible—if the claim is one that simply makes no economic sense—respondents must come

forward with more persuasive evidence to support their claim than would otherwise be

necessary."  Matsushita, 475 U.S. at 587.  Additionally, although "[i]n the context of an antitrust

case, the non-moving party's burden 'is no different than in any other case[,]' . . . what

constitutes a reasonable inference in the context of an antitrust case . . . is somewhat different

from cases in other branches of the law in that 'antitrust law limits the range of permissible

inferences from ambiguous evidence in a § 1 case.'"  In re Baby Food, 166 F.3d at 124 (quoting

Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992);

Matsushita, 475 U.S. at 588).  "To survive a motion for summary judgment . . . a plaintiff

seeking damages for a violation of § 1 must present evidence 'that tends to exclude the

possibility' that the alleged conspirators acted independently."  Matsushita, 475 U.S. at 588

(quoting First National Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968)).  This

is because mistaken inferences in the context of conduct that is consistent with permissible

competition "are especially costly because they chill the very conduct the antitrust laws are

designed to protect."  Id. at 594.  With these standards in mind, then, the Court analyzes: (1) the

economic plausibility of the alleged conspiracy, and (2) plaintiffs' evidence in support of their

allegations.

FOR PUBLICATION

The Court addresses the first point only briefly because it finds the alleged conspiracy to be quite plausible.  Although MBUSA argues that it "had no plausible economic incentive to participate in, or to encourage in any manner, a price-fixing scheme among its New York Region dealers," (Br. at 4), the record shows otherwise.  While the Court accepts MBUSA's uncontroversial assertion that an automotive manufacturer's dominant incentive is to have lower retail prices so that it can increase the volume of sales to dealers, there are clearly other incentives at play.  For example, it is undisputed that MBUSA had a target of 10% retained gross profit for its dealers.  This is unsurprising, as a:

> manufacturer often will want to ensure that its distributors earn sufficient profit to pay for programs such as hiring and training additional salesman or demonstrating the technical features of the product, and will want to see that "free-riders" do not interfere.  Thus, the manufacturer's strongly felt concern about resale prices does not necessarily mean that it has done more than the *Colgate* doctrine allows.[4]

Monsanto, 465 U.S. at 762-63.  Although it has a strong incentive to keep the volume of its sales high, MBUSA also has a legitimate interest in maintaining a financially healthy and viable network of dealers.  The admitted existence of the 10% objective makes this patently clear and is all that the Court requires to find that the alleged theory was economically plausible.

Turning to the evidentiary question, plaintiffs argue that they have both direct evidence and unambiguous circumstantial evidence of the alleged conspiracy and, as such, that the concerns expressed in Matsushita are absent here.  Plaintiffs advance the following as direct evidence: (1) the eyewitness testimony of Tamim Shansab; (2) the eyewitness testimony of Walter "Wes" Simmons; (3) the eyewitness testimony of George Zeigler; and (4) minutes from

---

[4]In United States v. Colgate & Co., 250 U.S. 300 (1919), the Supreme Court held that a "manufacturer can announce its resale prices in advance and fail to deal with those who fail to comply.  And a distributor is free to acquiesce in the manufacturer's demand in order to avoid termination."  Monsanto, 465 U.S. at 761.

FOR PUBLICATION

MBUSA meetings with its dealers.  Shansab, the dealer principal of the Coast Automotive Group and a participant in the early Sheft Kahn meetings, testified in his deposition that "[t]here was a collective agreement among the dealers to increase transaction prices" and that the Sheft Kahn meetings "were nothing but to get together and fix prices."  (Corrigan Cert. Ex. 32 at 990, 969.) Shansab testified that MBUSA personnel attended at least two meetings of the group and that MBUSA Market Manager Ed Chmielewski told Shansab that he was "required" to attend the Sheft Kahn meetings and submit confidential dealer financial information for distribution to the other dealers.  (Cooper Cert. Ex. 44 at 913.)  Shansab also testified that MBUSA Market Manager Joe Kurp threatened to reduce Shansab's supply of E-Class automobiles if he priced them too aggressively because the dealers had agreed not to discount them and the dealers were upset with Shansab's earlier discounting.  (Corrigan Cert. Ex. 130 at 378.)   Although MBUSA may dispute Shansab's testimony and his characterization of what took place at the Sheft Kahn meetings, if his testimony is accepted as true, an unlawful conspiracy involving at least some of the dealer-defendants will have been proven by direct evidence.  Shansab's testimony also presents, at the very least, circumstantial evidence of MBUSA's involvement in the conspiracy. The Court must determine, then, whether that evidence tends to exclude the possibility of independent action on the part of MBUSA and is sufficiently unambiguous to survive the motion for summary judgment.  Because MBUSA is situated differently from the other defendants by virtue of its vertical relationship with the dealers, an analysis of the proper legal treatment of MBUSA is prerequisite to the analysis.

At oral argument, counsel for MBUSA argued that a single opinion of the United States Supreme Court is dispositive of this case.  The case cited, Business Elecs. Corp. v. Sharp Elecs.

**FOR PUBLICATION**

Corp., 485 U.S. 717 (1988), held that "a vertical restraint is not illegal *per se* unless it includes some agreement on price or price levels."  Id. at 735-36.[5]   Because plaintiffs do not allege a specific price or price level beyond limiting discounting from MSRP, MBUSA argues that plaintiffs' case against it must be analyzed under the rule of reason.[6]  Since plaintiffs have prosecuted this case under a *per se* theory and have not defined a relevant antitrust market as the rule of reason requires, MBUSA contends that it is entitled to summary judgment.  The questions for the Court, then, are (1) whether plaintiffs' allegations against MBUSA amount to vertical rather than horizontal restraints, and (2) whether plaintiffs have adequately alleged "a specific price or price level."

One prominent treatise notes that "the term 'price fixing' is defined narrowly when the agreement at issue is vertical, but very broadly when it is horizontal."  II Phillip E. Areeda and Herbert Hovenkamp, Antitrust Law ¶ 2000b (2d ed. 2005).  "Indeed, the per se rule against so-called vertical price fixing, or resale price maintenance, requires a rather explicit agreement setting 'price or price levels,' and is not invoked by supplier-dealer agreements that merely 'affect' the price."  Id.  It is because vertical restraints may promote interbrand competition, the primary concern of antitrust law, that the Supreme Court has limited the scope of *per se* illegality

---

[5]"Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints." Business Elecs., 485 U.S. at 730.

[6]To establish a violation of § 1 of the Sherman Act under the rule of reason, a plaintiff must generally prove: "'(1) that the defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within the relevant geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximate result of that conspiracy.'" Rossi, 156 F.3d at 464-65 (quoting Tunis Bros. Co. v. Ford Motor Co., 763 F.2d 1482, 1489 (3d Cir. 1985)).  Under a *per se* analysis, prongs two and three are conclusively presumed.  Id. "[T]here is presumption in favor of a rule of reason standard" and "departure from that standard must be justified by some demonstrable economic effect, such as the facilitation of cartelizing."  Business Elecs., 485 U.S. at 726.

FOR PUBLICATION

in the context of vertical restraints.  Business Elecs., 485 U.S. at 724.  For this reason,

determining whether the alleged restraint is properly characterized as horizontal or vertical is a

necessary task for the Court.  Business Electronics "suggests that the proper distinction between

a horizontal and a vertical restraint lies in determining which kind of an arrangement produces

the restraint rather than analyzing its anticompetitive effects."  Big Apple BMW, 974 F.2d at

1376.  In the Business Electronics Court's own words, "a restraint is horizontal not because it has

horizontal effects, but because it is the product of a horizontal agreement."  485 U.S. at 730 n.4.[7]

 Whether the allegations in this case are the "product" of a horizontal agreement as opposed to a

vertical agreement, then, is a material question for the Court.

 The evidence in this case is ambiguous with regard to the motivating force behind the

alleged agreement.  While the dealers had an obvious interest in maintaining supra-competitive

prices, it is well established that a manufacturer generally does not share such an interest.

Business Elecs., 485 U.S. at 725 (due to interbrand competition, "a manufacturer's dominant

incentive is to lower resale prices.").  As already discussed, however, MBUSA had the admitted

motive to raise the average gross profits of its dealers.  When such an interest is pursued

unilaterally by a manufacturer in order to improve its position relative to its interbrand

competition, it may have procompetitive effects and is not per se unlawful.  See Monsanto, 465

U.S. at 760-62.  When such an interest is pursued by means of an agreement with a reseller "on

price or price levels," however, it is a per se unlawful vertical restraint.  Business Elecs., 485

---

[7]In a slightly different and more fully explicated form, "[w]hen dealer interests rather than manufacturer interests appear to be served, many courts describe a vertical restraint as "horizontal," even in the absence of collective action by dealers.  Such a classification is meant to express a finding that the restraint before the court serves a dealer's desire for excess profits rather than a possible manufacturer's desire for more efficient distribution through, for example, point-of-sale services."  II Phillip E. Areeda and Herbert Hovenkamp, Antitrust Law ¶ 2000b (2d ed. 2005).

FOR PUBLICATION

U.S. at 735-36.  Where the manufacturer is *coerced* by a dealer cartel into enforcing an agreement to maintain retail prices, the restraint is generally characterized as horizontal because it is the "product" of the horizontal cartel.  Id. at 730 n.4.  Because the plaintiffs in this case have not alleged that the dealers had the power to coerce or did in fact coerce MBUSA's participation, it would seem logical for the Court to analyze MBUSA's participation as a vertical restraint.  Business Electronics indicates the difficulty in reaching such a conclusion, however.  There, the Supreme Court characterized the facts of United States v. Parke, Davis & Co., 362 U.S. 29 (1960), as a horizontal conspiracy.  Business Elecs., 485 U.S. at 735.  In Parke, Davis, a drug manufacturer combined "with retailers in order to gain the 'retailers adherence to its suggested minimum retail prices'" and "also brokered an agreement among its retailers not to advertise prices below its suggested retail prices, which agreement was held to be part of the *per se* illegal combination."  Business Elecs., 485 U.S. at 735.  The Business Electronics Court found that "the agreement among retailers that the manufacturer organized was a *horizontal* conspiracy among competitors."  Id. (emphasis in original).  In Parke, Davis, as here, there was no indication that the retailers coerced the manufacturer's participation.[8]  Because MBUSA's alleged relationship with the dealer cartel in this case is substantially similar to Parke, Davis's role in that case, and

---

[8]The Third Circuit has also held that "a conspiracy is horizontal in nature when a number of competitor firms agree with each other and at least one of their common suppliers or manufacturers to eliminate their price-cutting competition by cutting his access to supplies."  Rossi, 156 F.3d at 462; accord Big Apple BMW, 974 F.2d at 1376 (same result where "a *number*" of automobile dealers conspired with a manufacturer to form a group boycott).  Both cases emphasize the involvement of multiple downstream participants in the conspiracy.  This Court, in an earlier opinion by Judge Wolin, cited Rossi to support its determination that "it is proper to analyze the entire restraint as one of horizontal price-fixing."  In re Mercedes Benz Antitrust Litig., 157 F. Supp. 2d 355, 362 (D.N.J. 2001).  Rossi and Big Apple BMW are not necessarily dispositive of the issue, however, because in those cases it was the horizontal dealer cartel that pushed for the boycott, thereby "producing" the restraint.  In this case, plaintiffs do not allege that the dealer cartel coerced MBUSA's participation.

FOR PUBLICATION

because the evidence of horizontal action is much stronger here, the Court accepts that MBUSA is appropriately treated as an alleged co-conspirator in a horizontal price-fixing conspiracy.[9]

It ultimately makes little difference whether the Court analyzes MBUSA's participation as a vertical or a horizontal restraint, however, as the result is the same.  This is because a vertical restraint is *per se* unlawful when it sets prices or price levels and the Court finds that plaintiffs' allegations and evidence in support are directed toward MBUSA's agreement with its dealers to maintain artificially high price levels.  The alleged agreed-upon price level is the MSRP.  Although plaintiffs do not contend that the agreement was to sell exclusively at MSRP, they allege that keeping prices as close to that level as possible was an integral part of the conspiracy.  (Opp'n Br. at 24.)

It has been noted that "the concept of an 'agreement on price or price levels' is not self-defining."  Herbert Hovenkamp, <u>Federal Antitrust Policy</u> § 11.5d (1994).  Although the phrase might be interpreted in different ways, this Court finds the most persuasive evidence of its meaning in the affirmed lower court decision in <u>Business Electronics</u>.  There, the Fifth Circuit held that, in order for a manufacturer's agreement with a distributor to be illegal *per se*, the "distributor must expressly or impliedly agree to set its prices at some level, although not a specific one.  The distributor cannot retain complete freedom to set whatever price it chooses."  <u>Business Elecs. Corp. v. Sharp Elecs. Corp.</u>, 780 F.2d 1212, 1218 (5th Cir. 1986); <u>see also</u> <u>Delong Equip. Co. v. Washington Mills Abrasive Co.</u>, 887 F.2d 1499, 1508 n.11 (11th Cir. 1989)

---

[9]The Court makes this determination cautiously, however, because "the horizontal label perniciously invites the tribunal to forgo analyzing the policies underlying" the *per se* characterization, "disposing of the case merely by citing precedents condemning genuine horizontal conspiracies between competitors."  II Phillip E. Areeda and Herbert Hovenkamp, <u>Antitrust Law</u> ¶ 1604 (2d ed. 2004).  It is to avoid this danger that the Court examines MBUSA's role as a vertical restraint, as well.

FOR PUBLICATION

("an agreement to inflate or 'pad' a price constitutes an agreement on prices or price levels.").

"The relevant question is not whether the agreement *names* a particular price, but whether the agreement is one that gives the competing dealer power over a competing dealer's prices, rather than merely about the level of the resale service activities that other dealers perform." Herbert Hovenkamp, Federal Antitrust Policy § 11.5d (1994). Here, plaintiffs present evidence that MBUSA agreed with its dealers to set prices as close to MSRP as possible and that aggressive discounting from MSRP, or "cheating," would result in punishment by MBUSA. Although specific numbers were not discussed, plaintiffs clearly allege that the dealers were not free to set prices at whatever level they chose.[10] Rather than a non-price restraint such as a territorial restriction or the dealer termination addressed by the Supreme Court in Business Electronics, plaintiffs in this case contend and provide evidence that there was an agreement, albeit somewhat vague in its terms, on the maintenance of price levels.[11]

Having undertaken the preceding analysis, the Court is satisfied that the testimony of Tamim Shansab alone tends to exclude the possibility of independent action on the part of MBUSA and is sufficiently unambiguous evidence adequate to survive the motion for summary judgment. Shansab's testimony regarding Joe Kurp's threat to restrict the supply of E-Class

---

[10]In this regard, the Court is aware of testimony by Tamim Shansab that the dealers were "free to do anything [they] want" with regard to prices. That statement was qualified by "with the exception of the pressures that were brought upon us by Mercedes-Benz," however. (Cooper Cert. Ex. 45 at 1253.) Evidence in the record indicates that such pressure involved sticking as close to MSRP as possible, pursuant to the dealers' agreement.

[11]While the Court is well aware that many prominent commentators have strongly criticized the *per se* illegality of vertical minimum price-fixing agreements, see, e.g., Pace Elecs. v. Canon Computer Sys., 213 F.3d 118, 123 n.4 (3d Cir. 2000); Robert H. Bork, The Antitrust Paradox 281 (1978), those concerns are today left for academic debate. In this case, there is evidence to support plaintiffs' allegation that MBUSA agreed with its dealers to maintain price levels as close to MSRP as possible. Whether there are procompetitive reasons behind MBUSA's alleged actions that improved interbrand competition is not an inquiry that the Court may now undertake. The Supreme Court has continually reaffirmed that retail price maintenance is a *per se* violation of the Sherman Act and the evidence in the record here supports the inference that MBUSA engaged in such practice in coordination with a horizontal dealer cartel.

FOR PUBLICATION

automobiles if Shansab discounted them, in particular, tends to exclude the possibility that

MBUSA was acting unilaterally.  This is particularly so because Kurp indicated that the other

dealers had agreed not to discount them.  Although the Court need go no further to deny the

motion, it briefly examines some of the other evidence presented.  Plaintiffs characterize much of

this additional evidence as direct, but the Court finds that, beyond the testimony of Tamim

Shansab, only circumstantial evidence of varying strength has been proffered.  The Court

examines the evidence "'*as a whole* to see if it supports an inference of concerted action.'"  <u>In re</u>

<u>Flat Glass</u>, 385 F.3d at 357 (quoting <u>Petruzzi's</u>, 998 F.2d at 1230) (emphasis added).

Walter Simmons, a service operations manager for MBUSA from 1995 to 1999, testified

that MBUSA Chief Executive Officer Michael Jackson told the dealers at a national meeting that

they were required to "sell the car for what the advertised price is" and "hold the line" on MSRP,

or face being put "out of business."  (Corrigan Cert. Ex. 36 at 60, 75.)  While such unilateral

policies are not illegal *per se*, <u>see</u> <u>Colgate</u>, 250 U.S. at 300, the testimony is evidence of

MBUSA's intent that its dealers sell as close to MSRP as possible.  Together with Shansab's

testimony and other evidence, Simmons' testimony is probative of the alleged price-fixing

conspiracy.  Other evidence includes the testimony of George Ziegler, the sales manager at Coast

Automotive Group in 1995.  Ziegler said that MBUSA Market Manager Joe Kurp told him that

he had to sell certain vehicles "at list price and hold list price."  (Corrigan Cert. Ex. 41 at 99.)

Ziegler also claimed that Kurp told him that a failure to increase gross profit levels would result

in a reduced allocation of vehicles.  (Corrigan Cert. Ex. 43 at 385.)  Other circumstantial

evidence identified by plaintiffs includes the allegedly secret nature of the Sheft Kahn meetings

and MBUSA's knowledge of and involvement in those meetings by encouraging dealer

**FOR PUBLICATION**

participation, by participating in two of the meetings, and by use of the Sheft Kahn reports.

While this evidence—as well as the numerous other pieces of evidence offered by plaintiffs but

not addressed here—may be individually inadequate to establish a violation of the Sherman Act,

taken with Tamim Shansab's testimony and viewed as whole, the evidence is sufficient to

support an inference of concerted action by MBUSA and to survive summary judgment.

**IV.  Mercedes-Benz Manhattan's Motion for Summary Judgment**

      Mercedes-Benz Manhattan is a wholly-owned subsidiary of MBUSA and the only

Mercedes-Benz dealership not an independent franchise.  It is undisputed that MBM attended at

least some of the Sheft Kahn meetings between 1996 and 1999 and participated in the exchange

of dealer financial data during that time.  Plaintiffs argue that MBM joined and participated in the

already-existing conspiracy, the existence of which is a question for the jury.  MBM counters that

there is no direct evidence that it agreed to fix prices and that the exchange of "stale" average

gross profit information via the Sheft Kahn group is not circumstantial evidence of coordinated

pricing activity.

      The Court has already determined that plaintiffs have presented adequate evidence for a

jury to find that a conspiracy existed among the dealers.  Because dealer participation in the Sheft

Kahn meetings is at the core of the alleged conspiracy, the Court must now assess MBM's

involvement to determine whether there is a triable question for the jury.  Because MBM did not

participate in the Sheft Kahn meetings until after Tamim Shansab stopped attending them,

Shansab's testimony that the dealers collectively agreed to fix prices is not direct evidence that

MBM was party to the agreement.  Despite this lack of direct evidence, the circumstantial

FOR PUBLICATION

evidence examined as a whole supports an inference of concerted action and tends to exclude the

possibility of independent action.

It is undisputed that MBM joined the Sheft Kahn group and exchanged financial data

with its direct competitors.  If the jury were to find that the Sheft Kahn meetings were

conspiratorial in nature, it could reasonably infer that MBM joined the ongoing conspiracy.  This

is so because plaintiffs offer testimony from accountant Wallace Sheft that the Sheft Kahn group

functioned in the same manner both before and after MBM joined, (Corrigan Cert. Ex. 35 at

104), and every indication is that the meetings functioned in the same way throughout the

conspiracy period.  While MBM credibly argues that mere attendance at meetings is not enough

to find agreement, plaintiffs offer more than just MBM's attendance.  Indeed, it is the admitted

exchange and discussion of otherwise-confidential financial data among competing dealers that is

perhaps the most potent evidence offered against MBM, and plaintiffs offer both expert and

dealer testimony that price information could easily be calculated from the exchanged gross

profit data.  Although "[t]he exchange of price data and other information among competitors

does not invariably have anticompetitive effects," United States v. Gypsum Co., 438 U.S. 422,

441 n.16 (1978), such "exchanges of price information . . . must remain subject to close scrutiny

under the Sherman Act."  Id. at 458-59.  When this sort of price information is exchanged with

members of a pre-existing price-fixing conspiracy, it is undoubtedly circumstantial evidence of

participation in that conspiracy.  If the fact finder accepts that the exchange of such data by the

Sheft Kahn group was in furtherance of a price-fixing conspiracy, MBM's agreement could

reasonably be inferred from its active participation in the group.

FOR PUBLICATION

MBM cites In re Citric Acid Litigation, 191 F.3d 1090 (9th Cir. 1999), for the proposition that attending meetings with conspirators does not amount to joining the conspiracy. The facts of that case are easily distinguishable from those here, however. There, the price-fixing was alleged to have taken place at "unofficial" meetings held by conspirators within a few days of official meetings of a trade association. There was no allegation that the defendant had attended the conspiratorial meetings, only the legitimate ones. The Ninth Circuit held that this was inadequate circumstantial evidence of participation in the conspiracy. Id. at 1097. Here, by contrast, MBM admits attending the very meetings where plaintiffs allege that the price-fixing took place. This is a difference of some consequence.

MBM also contends that "the Sheft Kahn group had legitimate, pro-competitive purposes" and was merely a "best practices" group, but there is evidence in the record that such groups in the automobile industry are virtually always conducted with geographically diverse dealers that are not in direct competition with one another. Indeed, exchanging confidential financial data with a direct competitor is unusual. In In re Citric Acid, Judge O'Scannlain noted that the trade association only distributed aggregate data "to preserve the confidentiality of individual members' sales and production figures." 191 F.3d at 1098. Although the defendant in that case did have competitor pricing information in its possession, the court determined that the price information was obtained "legitimately" and not pursuant to an agreed-upon exchange of pricing information among competitors. Id. at 1103. Here, by contrast, MBM admits to sharing confidential financial information with its direct competition. In re Baby Food is also instructive in this regard. In that case, the Third Circuit held that "[g]athering competitors' price information can be consistent with independent competitor behavior," and affirmed summary

-30-

FOR PUBLICATION

judgment because there was "no evidence of record showing reciprocal exchange of information by any executive of the defendants with price-fixing authority" and because the evidence did not show "an organized, concerted exchange of information among company executives or their authorized agents." 166 F.3d at 126, 137. Here, a "reciprocal exchange of information" by "corporate executives or their authorized agents" is admitted. Indeed, the information exchange took place between MBM and other alleged conspirators, whose membership in the alleged conspiracy the Court has already determined to be a question for the jury. Examining the evidence as a whole, the Court finds sufficiently strong circumstantial evidence of agreement that, if accepted, would exclude the possibility of independent action. The Court is satisfied that plaintiffs have shown "that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed" the plaintiffs. Matsushita, 475 U.S. at 588.

Although MBM's motion is denied, the Court briefly addresses miscellaneous arguments made by the parties. MBM argues that pricing information could not be calculated from the average gross profit data exchanged at the Sheft Kahn meetings. Because the Court has already admitted expert testimony that the jury could reasonably rely on in finding otherwise, it need not revisit the issue now.[12] MBM also contends that the exchanged data was four to eight weeks old and too "stale" to serve as a basis for coordination of future prices. Because MBM has cited no authority to conclusively establish this proposition, the Court must give plaintiffs the benefit of the doubt at the summary judgment stage that the data was not too stale to facilitate price coordination. The Court also notes in this regard that plaintiffs allege that a goal of the

---

[12]MBUSA also makes this argument in its motion for summary judgment. MBUSA's argument is likewise rejected.

**FOR PUBLICATION**

conspiracy was to reduce discounting from MSRP, and the existence of such discounting might

be determined from recent historical data.

Finally, the Court addresses plaintiffs' argument that MBM is charged with the

knowledge of its parent, MBUSA.  While MBM correctly argues that a subsidiary is not

ordinarily vicariously liable for the actions of its parent, 1 William Meade Fletcher et al., Fletcher

Cyclopedia of the Law of Private Corporations § 43.60 (perm. ed., rev. vol. 1999), the question

of knowledge is somewhat different from that of liability.  "The general rule is that the

knowledge of the parent corporation is not imputed to the subsidiary corporation . . . unless a

sufficient nexus between them is shown . . . to provide an equitable reason for disregarding the

separate corporate existences."  Thompson v. Air Power, Inc., 248 Va. 364, 371 (1994).

According to a prominent treatise cited in that case,

> when knowledge is acquired by the officers or agents of one corporation while acting
> on behalf of another corporation, this knowledge will not be imputed to the former
> corporation.  However, this rule is subject to exception where the corporations
> involved are close corporations, or where there are equitable reasons for disregarding
> the separate corporate entities.

3 William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Private Corporations §

814.10 (perm. ed., rev. vol. 2002); see also Ripa v. Owens-Corning Fiberglass Corp., 282 N.J.

Super. 373, 405 (App. Div. 1995).  Despite the extremely close relationship and obvious nexus

between MBUSA and MBM, the Court is not inclined to depart from the general rule in this case

to provide a blanket presumption of knowledge on the part of MBM.  No case cited by plaintiffs

stands for the proposition that such knowledge is automatically imparted and plaintiffs have not

made a showing that the equities weigh in favor of disregarding the separate corporate entities in

this case.  Even the Supreme Court's decision in Copperweld Corp. v. Independence Tube Corp.,

FOR PUBLICATION

467 U.S. 752, 771 (1984), that "the coordinated activity of a parent and its wholly owned

subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act,"

does not compel plaintiffs' desired conclusion because that case deals with the ability to conspire

rather than the transfer of knowledge.  Granting for the moment that MBM is MBUSA's agent,

which may well be the case given the similar facts and holding of Big Apple BMW, 974 F.2d at

1373, the Court is aware of no authority standing for the proposition that an agent is charged with

all of the knowledge of its principal.[13]

## V.  The Lessees and Mercedes-Benz Credit Corporation

The Court previously addressed the status of lessees in this case in its opinion reported at

364 F. Supp. 2d 468 (D.N.J. 2005), allowing for the possibility that "both the lessees and the

leasing companies suffered separate and distinct injuries which are compensable under the

antitrust laws."  Id. at 482.  MBUSA now moves to dismiss the claims of the lessee plaintiffs

based on a failure to provide evidence of the lessees' damages.  As the Court has already

determined, however, the testimony of Dr. Beyer is admissible to show that those plaintiffs who

leased through MBCC absorbed the entire overcharge resulting from the alleged conspiracy.  It

follows that Dr. Beyer's aggregate damage calculation may be used to prove the lessees' damages

and that MBUSA's motion must be denied.  Because the issue of MBCC is inextricably linked to

the issue of the lessees, MBUSA's motion for summary judgment on all claims based on the

sales of vehicles to MBCC is likewise denied.

---

[13]The reverse is usually true, however, as "the general rule is well established that a corporation is charged with constructive knowledge, regardless of actual knowledge, of all material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of employment."  3 William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Private Corporations § 790 (perm. ed., rev. vol. 2002).

FOR PUBLICATION

## VI.  Claims Accruing Before September 3, 1995

MBUSA argues that all claims accruing before September 3, 1995 are time-barred.  This argument is based on the four-year statute of limitations for private antitrust actions in Section 4B of the Clayton Act, 15 U.S.C. § 15b, and the filing date of plaintiffs' complaint, September 3, 1999.  Plaintiffs counter that the statute of limitations is tolled under the equitable doctrine of fraudulent concealment, which generally requires: "(1) an affirmative act of concealment; (2) which misleads or relaxes the plaintiff's inquiry, who (3) exercised due diligence in investigating his cause of action."  In re Mercedes-Benz Antitrust Litig., 157 F. Supp. 2d 355, 368 (D.N.J. 2001) (citing In re Lower Lake Erie Iron Ore Antitrust Litig., 99 F.2d 1144, 1178-79 (3d Cir. 1993)).  MBUSA contends that fraudulent concealment does not apply to toll the statute of limitations because:  (1) there is no evidence of affirmative acts of concealment; (2) there is no evidence of a self-concealing conspiracy; and (3) plaintiffs were not reasonably diligent in discovering their claims.  MBUSA points out that the burden is on plaintiffs to establish fraudulent concealment and argues that the burden cannot been met.

Plaintiffs deny that the claims are time-barred, arguing that: (1) there were affirmative acts of concealment; (2) the conspiracy was self-concealing; and (3) plaintiffs were diligent. Plaintiffs also argue that, although the ultimate burden of establishing fraudulent concealment is on them, MBUSA first bears the burden of establishing the elements of the affirmative defense of the statute of limitations.  Because MBUSA cannot demonstrate when the statute of limitations began to run, plaintiffs argue that MBUSA has not met its burden.  Finally, plaintiffs argue that the commencement of the statute of limitations is a question for the jury.

FOR PUBLICATION

As an initial matter, it must be noted that the Court's earlier opinion in this matter, reported at 157 F. Supp. 2d 355 (D.N.J. 2001) (Wolin, J.), dealt extensively with the issues at hand.  Although decided in the context of the motion to dismiss, the bulk of the analysis stands. Importantly, the Court found that:

> Alleged affirmative acts of concealment will state a claim for fraudulent concealment regardless of whether those acts are separate and apart from the acts of concealment involved in the antitrust violation.  This Court will also recognize the self-concealing conspiracy concept . . . [and] the Court will recognize as self-concealing those conspiracies in which concealment is so inter-twined with the conspiracy as a whole that the equitable foundations of the fraudulent concealment doctrine require the limitations period to be tolled.

Id. at 371.  Because discovery is now complete, the Court revisits the issues in light of the developed record.

### A.  Affirmative Acts of Concealment

On the first of MBUSA's three primary arguments, that there is no evidence of affirmative acts of concealment, MBUSA contends that the Sheft Kahn meetings were held openly and that their existence was known to non-participants.  MBUSA further argues that the evidence shows that participating dealers discussed the Sheft Kahn meetings with their employees and with non-participant dealers.  Finally, MBUSA contends that dealers freely joined and left the group during the period of the alleged conspiracy and that "[t]he alleged conspiracy could not have been successfully concealed if members were free to come and go."

Plaintiffs counter that the Sheft Kahn meetings were kept secret, pointing to the following evidence:  the meetings were limited to dealer principals; participants names were intentionally omitted from the Sheft Kahn reports; the meetings were identified by signs saying only "Mercedes Benz" (plaintiffs suggest a more accurate description would have been "Sheft Kahn

FOR PUBLICATION

Mercedes Benz Dealer Gross Profit Exchange"); most of the participating dealer-defendants denied the existence of the Sheft Kahn Group in answering the complaint; MBUSA and certain dealers denied that MBUSA compiled and provided average gross profit information to its dealers despite documentary evidence to the contrary; a Mercedes-Benz spokeswoman stated that MBUSA had never and would never establish a "one price" policy at its dealerships; and, finally, Walter Simmons, a former MBUSA employee, testified that MBUSA Market Manager Joe Kurp threatened that Simmons "needed to fear for his family" if he testified that MBUSA retaliated against Tamim Shansab.

The Court first notes that each piece of evidence offered by plaintiffs might readily be explained by reasons other than the concealment of a conspiracy. What motivated defendants to take the actions alleged by plaintiffs and whether such actions actually took place, however, are questions of material fact. Because a rational jury could find that certain of plaintiffs' allegations amounted to affirmative acts of concealment, determination of the question at the summary judgment phase would be inappropriate.

### B. Self-Concealment

On the issue of the self-concealing nature of the alleged conspiracy, MBUSA argues that plaintiffs cannot prove that the conspiracy was self-concealing. Plaintiffs contend that this Court earlier granted an inference that the conspiracy as alleged was self-concealing and that defendants have presented nothing that would justify removal of the inference.

In its earlier opinion, the Court held that plaintiffs had "successfully alleged a self-concealing conspiracy," noting that "[i]t is fair to infer that the conspiracy in the form alleged by plaintiffs would not have worked at all had it been public knowledge. Indeed, the contrary

**FOR PUBLICATION**

inference would strain credulity." 157 F. Supp. 2d at 372-73. The Court granted the inference because "[o]n the facts as alleged, inter-brand competition, the avoidance of prosecution and even mere customer relations would require the alleged conspirators to conceal the facts that the prices of Mercedes-Benz automobiles has been fixed at supra-competitive prices." Id. The Court's position on the matter remains unchanged. If plaintiffs are able to prove their allegations, the conspiracy was self-concealing.

### C. Plaintiffs' Diligence

On the question of plaintiffs' diligence in discovering their claims, MBUSA argues that all of the evidence and allegations upon which plaintiff relied in 1999 could have been discovered before September 3, 1995. In support of this argument, MBUSA argues that Tamim Shansab left the Sheft Kahn group in 1994 and that a diligent customer shopping at more than one dealership would have noticed coordinated pricing. Plaintiffs counter that "in the summary judgment context it [is] up to defendant[] as the moving part[y], to demonstrate conclusively that the plaintiffs, through the exercise of reasonable diligence, would have discovered adequate ground for filing suit." State of Texas v. Allan Constr., 851 F.2d 1526, 1533 (5th Cir. 1998) (internal quotations omitted). The Court does not believe that MBUSA has met its burden in this regard. To the contrary, the Court finds its earlier statement to be relevant:

> Nor can the Court accept defendants' argument that a reasonably diligent purchaser would have comparison shopped between more than one dealer and realized from that comparison that the dealers were engaged in price-fixing. It is far from clear that comparison shopping would have revealed anything of the kind. . . . [N]ormal consumers exercising reasonable diligence in the circumstances might have no inkling that they had paid a supra-competitive price and no reason to inquire further until they read of similar accusations by others in the press.

FOR PUBLICATION

157 F. Supp. 2d at 374.  With regard to Tamim Shansab, the Court is likewise unpersuaded by MBUSA's arguments.  The Court is aware of no evidence that Mr. Shansab made his allegations known to class members before filing his own lawsuit and speaking to The New York Times.  The Court cannot see how a reasonably diligent plaintiff would have learned of the alleged conspiracy from Mr. Shansab before he went public with his allegations.

In sum, the issues of fraudulent concealment and equitable tolling of the statute of limitations cannot be decided before trial.  Individual plaintiff's claims accrued when and if they were injured by paying a supra-competitive price for a Mercedes-Benz vehicle.  See Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338-39 (1971) (noting the general rule that a cause of action accrues when the defendant commits an act in violation of the antitrust laws that causes injury to the plaintiff's business); see also II Phillip E. Areeda and Herbert Hovenkamp, Antitrust Law ¶ 320b (2d ed. 2000) (citing Zenith and noting as an example that a home buyer paying an illegally-inflated closing fee would suffer injury and could maintain an action only upon payment of the fee).  Unless plaintiffs can establish fraudulent concealment at trial, the statute of limitations will apply to bar the claims of plaintiffs who paid a supra-competitive price before September 3, 1995.  As already discussed, however, fraudulent concealment may be established by proof of the conspiracy as alleged, given its self-concealing nature.

## VII.  The Post-1994 Claims

MBUSA argues that summary judgment is appropriate for all claims arising after Tamim Shansab stopped attending Sheft Kahn meetings in August 1994.  MBUSA contends, without authority, that "[t]here is no evidentiary principle that permits Plaintiffs to project Shansab's testimony forward past August 1994."  MBUSA is mistaken.  If the jury were to find that a

**FOR PUBLICATION**

conspiracy existed before Shansab left the Sheft Kahn group, the jury may infer that the

conspiracy continued after he left.  It is elementary that a conspiracy is "presumed to continue

unless there is affirmative evidence that the defendant abandoned, withdrew from, or disavowed

the conspiracy or defeated its purpose."  United States v. Jiminez Recio, 537 U.S. 270, 277

(2003).  Because MBUSA denies the conspiracy, it presents no affirmative evidence of

withdrawal.  Without such evidence, however, the jury may presume that any conspiracy

beginning before August, 1994 continued throughout the period alleged.

**VIII.  The C-Class Purchasers**

MBUSA seeks dismissal of the claims made by those class members who purchased

Mercedes-Benz C-Class vehicles.  MBUSA points out that plaintiffs' damages expert, Dr. Beyer,

has determined that C-Class purchasers suffered no damages as a result of the alleged conspiracy.

MBUSA also points out that plaintiffs can point to no threat of future injury that would entitle

the C-Class purchasers to injunctive relief.  Without proof of antitrust injury or damages,

MBUSA argues that it is entitled to summary judgment against all class members that purchased

C-Class vehicles and that those purchasers are entitled to prompt notice that they can obtain no

damages recovery as a result of a jury verdict.

Plaintiffs counter that MBUSA's motion is untimely because it was filed more than a

month after the deadline for the filing of dispositive motions.  In response to MBUSA's

argument that it filed late because of continuing discussions regarding a consent decree

dismissing the claims, plaintiffs argue that they only agreed to *consider* the consent decree, not to

its entry.  On the substantive question, plaintiffs contend that MBUSA has provided no authority

for the proposition that C-Class purchasers are entitled to *no* relief.  Although plaintiffs admit

**FOR PUBLICATION**

that the C-Class purchasers have suffered no damages, they argue that these class members are

entitled to declaratory and injunctive relief.  Plaintiffs further argue that an award of declaratory

or injunctive relief would support an award of attorneys' fees and costs.

In his opinion on class certification, Judge Wolin earlier denied class certification under

Fed. R. Civ. P. 23(b)(2) because the plaintiffs in this case seek predominantly money damages.

Judge Wolin noted that:

> Plaintiffs seek compensation for a past wrong allegedly perpetrated when they bought
> their Mercedes-Benz automobiles.  The complaint seeks an injunction against
> continuing the conspiracy, but there is nothing to suggest that class members will buy
> more automobiles from the defendants in the future.  Thus any prospective harm that
> an injunction might prevent is speculative.

213 F.R.D. 180, 186 (D.N.J. 2003).  That opinion also noted that "[t]he parties or the Court

remain free to revisit the issue later in the case should circumstances evolve."  Id.  Although

there is no apparent indication that circumstances have evolved, the Court has not yet heard the

parties on the issue of injunctive relief and is not likely to do so until after the trial in this matter

is complete.  Notwithstanding Judge Wolin's statements regarding Rule 23(b)(2) class

certification, the claim for injunctive relief can be maintained under Rule 23(b)(3).  See 5 James

Wm. Moore et al., Moore's Federal Practice § 23.44[2] (2006) ("Rule 23(b)(3) does not require

that declaratory or injunctive relief be sought.  Rather, it requires only that a class action achieve

an economy of time, effort, and expense without sacrificing procedural fairness.  A court may

certify a class meeting that standard *irrespective of the relief that plaintiffs seek*.") (emphasis

added).

When the Court does address the issue of plaintiffs' claim for injunctive relief, the focus

of the analysis must be on the threat of future violations faced by the plaintiffs.  This is so

**FOR PUBLICATION**

because "one receives damages for the consequences of previous violations and an injunction for

threatened future violations, which are never recompensed by the damages award to the extent

that the latter covers only the past."  II Phillip E. Areeda and Herbert Hovenkamp, <u>Antitrust Law</u>

¶ 326a (2d ed. 2000); <u>see also</u> <u>Zenith Radio Corp. v. Hazeltine Research, Inc.</u>, 395 U.S. 100, 130

(1969) (pointing out that the Clayton Act "authorizes injunctive relief upon the demonstration of

'threatened' injury.  That remedy is characteristically available even though the plaintiff has not

yet suffered actual injury.").  With regard to the C-Class purchasers, the Court notes that

injunctive relief in antitrust actions "is not dependent on the existence of actual or measurable

injury."  II Phillip E. Areeda and Herbert Hovenkamp, <u>Antitrust Law</u> ¶ 326a (2d ed. 2000).

While plaintiffs have not addressed the question of the threat of future violations, MBUSA

contends that no allegations of future violations exist in this case.  The Court is not so sure.  The

possibility of future violations must be the basis for plaintiffs' request for injunctive relief.  If

plaintiffs are able to prove the existence of an unlawful price-fixing conspiracy at trial and

convince the Court that permanent injunctive relief is warranted, there is no apparent reason to

exclude the C-Class plaintiffs.  If the conspiracy is demonstrated, the fact that plaintiffs failed in

past attempts to charge supra-competitive prices for C-Class vehicles does not mean that there is

no threat of success in the future.  Additionally, the C-Class purchasers have already received

notice, pursuant to recent preliminary settlement approvals, that plaintiffs are no longer seeking

damages on their behalf.  This renders moot MBUSA's concern that the C-Class purchasers be so

notified.  For these reasons as well as MBUSA's tardiness in submission, the motion is denied.

**FOR PUBLICATION**

## CONCLUSION

For the foregoing reasons, MBUSA's and MBM's motions for summary judgment are denied.  MBUSA's first motion *in limine*, motion to strike the affidavit of John C. Beyer, and motion for leave to file a motion for partial summary judgment dismissing the claims of C-Class plaintiffs are also denied.  Plaintiffs' motion to strike the expert testimony of Richard H. Kotzen is denied on the procedural grounds addressed herein.

<u>s/William H. Walls</u>
United States Senior District Judge

**FOR PUBLICATION**

**Appearances**

Eugene A. Spector
Jeffrey J. Corrigan
Simon B. Paris
Spector, Roseman & Kodroff, P.C.
1818 Market Street
Suite 2500
Philadelphia, PA 19103

Michael Hausfeld
Paul T. Gallagher
R. Joseph Barton
Cohen, Milstein, Hausfeld & Toll, P.L.L.C.
Suite 500
1100 New York Avenue, NW
Washington, D.C.  20005

Anthony J. Bolognese
Joshua H. Grabar
Bolognese & Associates, LLC
Two Penn Center Plaza, Suite 200
Philadelphia, PA 19103

Lisa J. Rodriguez
Trujillo Rodriguez & Richards LLC
8 Kings Highway West
Haddonfield, NJ 08033
                    Attorneys for Plaintiffs

J. Michael Cooper
Bryan Cave LLP
700 Thirteenth St., NW
Washington, DC 20005

Charles A. Newman
Bryan Cave LLP
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, MO 63102

**FOR PUBLICATION**

Michael S. Waters
McElroy, Deutsch, Mulvaney & Carpenter, LLP
Three Gateway Center
100 Mulberry Street
Newark, NJ 07102
      Attorneys for Defendant Mercedes-Benz USA, LLC

James A. Moss
Mikhail Ratner
Herrick, Feinstein LLP
2 Park Avenue
New York, NY 10016
     and
2 Penn Plaza East
Newark, NJ 07105
      Attorneys for Defendant Mercedes-Benz Manhattan, Inc.